Filed 7/18/16  In re J.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D069543 |
| Plaintiff and Respondent, | (Super. Ct. No. J508382G) |
| v. | |
| JAMES A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel for Plaintiff and Respondent.

James A. (Father) appeals from an order modifying his visitation with his teenage son, J.A., from unsupervised to supervised.  The court modified visitation because Father, after arming himself with a hammer, had been recently involved in domestic violence with one of his other teenage children.  Following that incident, when a social worker told Father his contact with J.A. was being temporarily suspended, Father replied, "I will kick your fucking ass you motherfucker. . . .  Fuck you in your ass bitch."  When the social worker suggested Father attend anger management counseling, Father said, "I've already done all those services and they don't do shit."

Father contends the court abused its discretion in determining it was in J.A.'s best interest to have supervised visitation.  We reject that contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *February 2012 Domestic Violence*

In February 2012 Father was living with his girlfriend, Katrina B., and his son, J.A., who was then 10 years old.  Police arrived at the home after J.A.'s grandmother called, reporting that Katrina B. had a knife and was attempting to stab Father.

Police noted that J.A. was "very shaken by the incident."  About a week later, J.A. told a social worker he was "scared."  He said Father and Katrina B. fight:  "Sometimes they just scream, they call police if it is bad, if not they just go back to sleep."  J.A. was afraid to go home because he felt "scared whenever she [Katrina] starts fighting and yelling."

Father told the social worker there had been three prior domestic violence incidents with Katrina B.  He said he was physically abused as a child by his mother and

2

had been physically disciplining J.A. "for the past year because of his behavior issues at school." J.A. had several incidents of aggressive behavior at school and was about to be expelled because of his violent outbursts.

J.A.'s mother was not living with Father at the time of this incident. She has convictions for prostitution, using controlled substances, petty theft, and battery. She has been diagnosed with paranoid schizophrenia and has eight children, the first four of which tested positive at birth for crack cocaine.

Father has convictions for misdemeanor battery and use of controlled substances. In a conversation with a social worker, "he admitted to a lengthy battle with cocaine addiction."

B. *Dependency*

In February 2012 the San Diego County Health and Human Services Agency (Agency) filed a petition on behalf of J.A. under Welfare and Institutions Code[1] section 300, subdivision (b).[2] In preparation for the March jurisdiction and disposition hearing, the Agency reported that Father "has a history of domestic violence with his girlfriends" and that J.A. was frightened because of those incidents. After examining J.A., a therapist

---

[1]    All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    Section 300, subdivision (b)(1) provides in part: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court. [¶] . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

3

reported that J.A. was "really disturbed and fearful." J.A. was aggressive with his peers and counselling staff.

In April 2012 the court found J.A. was a person described in section 300, subdivision (b). In May 2012 the court ordered J.A. to be placed in a licensed group home with supervised visitation by Father.

C. *J.A.'s Course and Father's Visits During 2012*

In May 2012 J.A. underwent an extensive psychological evaluation and was diagnosed with depressive and disruptive behavior disorders. He was aggressive and violent—hitting, kicking, biting, and throwing objects.

By October 2012 Father had participated in domestic violence treatment and reported he had "gained a great deal of 'insight.'" His random drug tests were negative. Father was having weekly unsupervised visits with J.A., who stated he would like to return home to his Father.

D. *Progress in First Half of 2013*

By April 2013 the number of reported incidents of serious aggression by J.A. declined substantially. He was involved in weekly therapy with Father, who was also making progress. Father had completed the 26-week domestic violence treatment and had also completed a parenting course and successfully passed random drug tests. J.A. and Father were having eight-hour visits, and J.A. looked forward to those visits. A social worker visited Father's apartment and found it appropriate for overnight visits. J.A. said he wanted to return to Father's home. The social worker stated Father had made "great progress over this reporting period" and overnight visits were scheduled.

4

E. *Setbacks When Father Moves to Texas*

In June 2013 the social worker informed the court that Father had not exercised overnight visitation with J.A. over the previous five weeks, had not been in contact with the Agency, and was not returning voice mail messages.

In August 2013 the social worker reported that Father had moved to Texas sometime in May or June 2013 to seek employment. As a result, Father had stopped visiting J.A. and his conjoint therapy with J.A. was terminated.

In a telephone conversation with the social worker, Father was "very angry and antagonistic," would not confirm when he moved, and stated, "You guys do what you're gonna do. [J.A.] is gonna be 18 in a few years and will [*sic*] deal with it then." The social worker concluded, "Due to [F]ather's apparent changes and uncertainty in his living situation, and lack of contact and participation with [J.A.], visitation between [J.A.] and [F]ather appears to need to be supervised upon the return of his involvement with [J.A.]."

In September 2013 the social worker reported that Father had not communicated with her since the last hearing. J.A. was doing "generally well." The social worker stated that Father's "location in Texas, and lack of completion of his case plan and contact with his son or the Agency indicates his unwillingness to make efforts to have his son return to him." The court continued J.A.'s dependency status and terminated Father's reunification services.

In March 2014 J.A.'s "violent outbursts increased from about 7–10 per quarter to 41 . . . ." The social worker reported that J.A. suffers from posttraumatic stress disorder,

5

"which causes him to go into rages when he is triggered by subtle disturbances." Father, who was living in Texas, had consistent telephone contact with J.A., who reported "mostly . . . positive things about talking with his father . . . ."

F. *Father Renews Interest in Reunification*

By May 2014 J.A. was having more frequent telephone contact with Father. The social worker reported that Father was now more receptive to participate in his son's care. Father provided the Agency with proof of employment and stable housing. Father said he was now living with his "wife," Tammy B., and their two sons, ages 16 and 10.

Father contacted Texas mental health care providers regarding individual therapy and psychiatric services for J.A. if he were to be placed in Father's Texas home. Father participated in the treatment team meetings and said he was willing "to do whatever it takes to get his son to Texas," including participating in conjoint therapy sessions with J.A. by telephone.

Meanwhile, J.A. "continued to exhibit aggressive behaviors," including eight "incidents involving aggressive/assaultive behaviors towards peers and staff." J.A. said he wanted to live with Father; however, the Agency remained concerned "over the severity of [J.A.'s] behaviors."

Between May and July 2014 J.A. had four psychiatric hospitalizations because of assaults. In one incident, J.A. punched and kicked a teacher. In another, J.A. "expressed homicidal and suicidal ideation."

Father "expressed a great deal of frustration, helplessness, and fear for his son." Although still expressing a desire for J.A. to be returned to his home, Father said he was

6

"willing to compromise" and have him placed in a licensed group home near Father's Texas residence.

G. *Father's Texas Home Conditions Deemed Favorable, with Conditions*

In August 2014 the Texas Department of Family and Protective Services (TFS) visited Father's home, conducted an investigation, and approved Father's home for J.A.'s placement, with conditions. Father was living with Tammy B. and their two sons. Tammy B. would be the "primary caregiver for the children," including J.A.

The TFS report states that Father "does not consume alcohol or use drugs," and that he "denies any experimentation with drugs in his lifetime."[3] His 16-year-old son also denied using drugs or alcohol.[4]

However, TFS was concerned that Father attributed J.A.'s violence to his removal from the family home, rather than to the effects of domestic violence. Because of these concerns, it required that prior to placing J.A. in Father's home, a therapist would have to be obtained for J.A., "and the family would also benefit from participation in family therapy . . . ."

H. *The Court Denies Father's Section 388 Petition*

In August 2014 Father filed a petition under section 388, seeking to have the court modify the existing placement order, to instead place J.A. in Father's Texas home.[5]

---

3      This is inconsistent with Father's statements to the Agency in February 2012, where he admitted to "a lengthy battle with cocaine addiction."

4      This is inconsistent with Father's statements to the social worker in October 2015, when he said "[our 16-year-old] has a history of delinquent behavior and drug use."

7

However, in November 2014 J.A. was continuing to engage in "physical and verbal aggression towards peers and staff, going out of supervised areas, property destruction, and injuring others by throwing objects." During some of these incidents, J.A. threatened to kill staff.

The social worker had concerns about whether Father would provide necessary therapeutic services for J.A. Father was now refusing to participate in conjoint therapy with J.A. Father insisted that J.A.'s violent behavior was caused by the Agency, which Father said had created a "monster" by removing J.A. from the family home. Father's belief was based, in part, on reports that J.A.'s behavior improved when he learned Father was coming to visit. Father denied that J.A.'s aggression was caused by repeated exposure to domestic violence while residing with Father.

Meanwhile, there was at least one positive development. The social worker interviewed Tammy B. and was impressed with her ability to care for J.A. if he were to be placed with Father. The social worker described Tammy B. as "well-organized," and willing and able to participate in J.A.'s services, including family therapy. Tammy B. explained how she disciplined their 16- and 10-year-old sons without using corporal punishment, and that she was aware of J.A.'s behavioral issues. She knew J.A. had special needs and she said she was prepared to give him the love needed for healing. The

5    Section 388, subdivision (a)(1) provides in part:  "(a)(1) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

social worker characterized Tammy B as "a loving, calm, and organized mother. She expressed at multiple times how excited she is for [J.A.] to come home." Father stated Tammy B. would be caring for J.A. if he were placed in the family's home.

In December 2014 the social worker reported that Father "is in need of extensive psycho educational services to understand [J.A.'s] behaviors and triggers, and how they are related to his trauma and experiences with domestic violence." The Agency stated that conjoint therapy sessions are "vital" for J.A. and Father. To facilitate visitation, the Agency offered to pay Father's airfare "on a monthly basis" to visit J.A. in California.

The court denied Father's section 388 petition, determining it was not in J.A.'s best interests to place him with Father. The court directed the Agency to report on progress made to identify a group home near Father's residence in Texas.

I. *Placement in Group Home in Texas*

In January 2015 J.A. continued to be violent, in one instance punching his therapist. The Agency located a group home in Texas and began proceedings to authorize J.A.'s out-of-state placement.

In April 2015 the Agency provided airfare for Father to have an unsupervised visit with J.A. for two days. The social worker reported the visit went well. Afterwards, J.A. said he wanted to move to Texas as soon as possible.

In June 2015 the Agency reported that J.A. had been involved in 13 violent incidents since February. J.A. assaulted a staff member and said he wanted to kill him. J.A. also made other homicidal threats to staff, stating, "I'm going to get a weapon and

9

come back and beat all y'all asses"; "I'm going to kill all you bitches, just watch"; and "I'm going to kill all you motherfuckers, just watch. You think I'm playing?"

Additionally, J.A. admitted to hearing voices. He told a social worker he sometimes speaks to his stuffed bear and sometimes it will speak back to him. The social worker noted that J.A.'s mother is a diagnosed paranoid schizophrenic, "and it appears that [J.A.] may be at risk of developing similar psychiatric symptoms."

Despite J.A.'s violence, threats to kill, and auditory hallucinations, Father told the social worker he did not understand why J.A. "cannot just come home." The social worker concluded that Father "refuses to acknowledge the severity of [J.A.'s] mental health concerns, ongoing violent behaviors, or the established necessity and Court order for [J.A.'s] placement at the group home level of care."

In the same month, June 2015, the social worker identified a suitable group home in Texas called Devereux. On June 17 the court approved J.A.'s placement there; however, it appeared Devereux would not be certified until late September.

J.A. continued his violent behavior. He choked and punched another juvenile and threatened staff. He hit walls, threw desks, and punched a teacher. In July 2015 J.A. assaulted staff and destroyed more property.

Because J.A.'s violence was escalating, the social worker recommended that J.A. not be placed in Father's home. The social worker noted that Father had not followed through in researching and obtaining a therapist near his Texas home to support J.A. should he be placed there. Moreover, Father "has not acknowledged the significance of the trauma and loss [J.A.] has endured nor the depth and severity of his ongoing issues."

10

After the social worker informed Father of these incidents, Father became angry and abusive. The social worker was concerned that Father's own volatility would exacerbate J.A.'s "already severe symptoms" and recommended J.A. be placed in a licensed group home in Texas.

After considering this information, on July 21, 2015 the court set a hearing for October 2015 to determine placement. Meanwhile, the court authorized Father to have unsupervised overnight visits in San Diego and unsupervised overnight visits in Father's home in Texas, with the advance concurrence of J.A.'s lawyer.

In September 2015 the social worker received "dozens of serious incident reports" about J.A.'s behavior. The most significant occurred when J.A. attacked and chased the school principal into a building where she had to barricade herself in an office and yell for help. The social worker concluded his report, stating:

> "[J.A.] has a history of exposure to serious domestic violence and heavy parental substance abuse and it is likely that he was exposed to narcotics and alcohol in utero. There is also a very strong family history of paranoid schizophrenia on his mother's side of the family and there have been sporadic reports of auditory hallucinations and other symptoms congruent with this history. Since coming into care, [J.A.] has displayed acute symptoms of post-traumatic stress and had many violent outbursts that resulted in injury to others. His recent displays of anger actually represent a drastic improvement from where he started several years ago."

On September 22, 2015, the court authorized J.A. to be discharged from San Diego and placed in Devereux.

On October 9, 2015, the social worker reported that J.A. had made "remarkable progress" at Devereux. With one exception, "all other reports have been positive."

11

Father was scheduled for an unsupervised overnight visit in October, with the consent of J.A.'s lawyer.[6] Father had changed jobs to allow him more time with his family, and the "immediate and extended family appear very supportive and loving toward [J.A.] . . . ."

The Agency was "optimistic and hopeful," but wanted J.A. to maintain stability "for a significant period of time before making further changes to his placement." In the meantime, the Agency supported "regular overnight visits" between J.A. and his family on weekends and holidays and urged "caution is in order regarding a timeline for a transition home due to [J.A.'s] history of severe behaviors and the length of time since he has been in a home-like environment . . . ."

J. *Domestic Violence in Father's Home*

On October 16, 2015, Tammy B. called the social worker and left a message. Upon returning the call, the social worker spoke to the now-17-year-old son, who said he and Tammy B. were being treated for injuries sustained that morning during an altercation with Father. He stated Father struck him in the head with a hammer, giving him a concussion, and also struck Tammy B., injuring her foot. The social worker notified Devereux staff to immediately suspend all contact between J.A. and Father.

According to the police report, there was an argument between Father and Tammy B. over money that escalated into a physical altercation between them. Their 17-year-old

---

6    In their briefs, Father and the Agency initially spar over whether the court order existing when the Agency filed its section 388 petition provided for supervised or unsupervised visitation. As noted in the text, the October 2015 interim review report states unsupervised visits in Texas were allowed if agreed to by J.A.'s attorney. This was consistent with the court's order of July 21, 2015.

son became involved in the fight. A porcelain toilet cover and hammer were used as weapons. The report stated that Father had been drinking alcohol at the time of the incident.

Tammy B., their 17-year-old son, and Father gave conflicting accounts to the police, who solicited a handwritten statement from Father but not from Tammy B. or the son. The police determined that Father was the victim. Later, Father obtained protective orders prohibiting the 17-year-old and Tammy B. from having any contact with him or the now-11-year-old son. Tammy B. and the 17-year-old son were arrested on misdemeanor assault charges, were held in custody overnight, and released the next day. Father was not arrested.

The social worker telephoned Father to learn what happened. He was "immediately argumentative" and stated, "Do your motherfucking homework before you call me with that bullshit." When the social worker asked about the incident, Father said that Tammy B. and their 17-year-old son were "both full of shit." When the social worker told Father that based on the information available, all contact between him and J.A. was being suspended, Father stated, "I will kick your fucking ass you motherfucker," and "That's it, I'm calling my fucking attorney and I'm going to sue your ass for this shit," and "I'm not putting up with your bullshit no more. Fuck you in your ass bitch," and then hung up the telephone.

Regarding the incident, Father stated that his 17-year-old son has a history of delinquent behavior and drug use and that he could no longer parent him effectively. Father said that after he told him to leave the family home, Tammy B. said, "If he can't

13

stay here, then I won't help you with [J.A.]." Then, according to Father, Tammy B. began hitting him.

The social worker asked Father how the 17-year-old had received a concussion and bump on the head, if he (the 17-year-old) was the aggressor. Father stated, "I don't know . . . . It wasn't done by me."

When the social worker asked Father how he might handle such a situation differently in the future, Father stated, "What could I have done differently? I did everything right." According to the social worker, Father placed the blame for the entire incident on Tammy B. and the 17-year-old and refused to acknowledge any role he may have played in the situation other than as a victim.

Tammy B.'s version was completely different. She told the social worker that Father got a hammer and started swinging it, hitting the 17-year-old in the head. During the incident, she managed to take the hammer from Father. When police arrived, she was still holding the hammer, which is why she was arrested and the police identified her as the attacker.

Tammy B. would not elaborate further. It appeared to the social worker that Tammy B. was "afraid to state any information that might be perceived as damaging to [Father] and his chances of regaining custody of [J.A.]." Tammy B. had moved out and said she would not care for J.A. because she is not his mother. She added, "I don't want to make any trouble. He [J.A.] is going to be perfectly safe with his father." She denied any knowledge of Father's using alcohol or drugs recently.

14

The 17-year-old told the social worker that Father was out of control and attacked him and Tammy B. with a hammer.

This was not the first police response to domestic violence at Father's Texas home. Police records show violent incidents at the home on May 29, 2015, and September 13, 14, and 20.

In the May 29, 2015 incident, Father called the police, reporting that his 17-year-old son was threatening him. However, Tammy B. told the police that Father "threatened to kill her [17-year-old son] son because he would not take out the trash."

In the September 14, 2015 incident, a neighbor called the police, reporting that Father was attempting to run over the 17-year-old son with his motor vehicle. Summarizing the recent police calls to Father's home, the social worker stated:

> "It is apparent . . . that domestic disputes have been occurring with regularity in the home very recently and that all parties in the
> . . . home have been displaying significant emotional and behavioral instability."

Meanwhile, on October 18, 2015, Tammy B. sent a text message to the social worker stating, "You need to reevaluate [Father]. Concerning [J.A.]. His method of disiplen [*sic*] has changed[.] He likes to hit children with weapons."

On October 20, 2015, the court conducted a hearing. The Agency expressed concern that violence could occur "in visits between [Father] and [J.A.] and could somehow affect the positive changes that are occurring at this time." The Agency asked the court "to grant the Agency the authority to revert visitation back to supervised at the group home until we can complete this investigation to ensure that there will not be any

15

type of inappropriate communication between [Father] and [J.A.]." The Agency's lawyer stated, "So the situation in the household is clearly volatile, involved an adult and a teen, and is something that needs further investigation before moving away and returning to the situation where we were before the transition took place. [¶] Very clearly, there's something going on in the household, and [the Agency] would like to investigate that further."

J.A.'s lawyer supported the Agency's request.

The court issued an order stating in part, "The court temporarily suspends Father's visits at his home. Father may have supervised visits with the minor at his group home. Minor may not leave the grounds of the group home with Father."

K. *The Agency Files a Section 388 Petition*

On October 22, 2015, the Agency filed a petition under section 388, seeking to modify the existing visitation order to allow only "[c]losely supervised contact" between Father and J.A.. In an addendum report, the social worker stated there was "a pattern of domestic . . . violence occurring recently in [Father's] residence" that "escalated to an extremely dangerous level . . . . Of grave concern is [Father's] reported use of a hammer and his vehicle as weapons against his oldest son."

The social worker was also concerned because Tammy B. was no longer living in Father's house. Thus, the intended primary caregiver for J.A. was no longer available. Moreover, Father was now working nights and sleeping during the day. As a result, "Extensive child care arrangements would be necessary to ensure [J.A.'s] safety were he placed in the home."

16

The social worker also believed there was a high risk of a physical altercation between J.A. and Father, stating:

> "Additionally, [Father] has an acknowledged history of addiction to crack cocaine and alcohol and was observed drinking alcohol on the morning of the incident on 10/16/2015. Regardless of any substance abuse which may be occurring, [Father] has demonstrated sustained patterns of emotional and behavioral instability in the home and in his communications with the Agency and court. He has displayed no remorse for the injuries his family sustained nor has he taken any responsibility for his role in the situation. Furthermore, [Father] has offered no alternatives as to how he might handle or prevent a similar such situation in the future. . . .
>
> "Absent significant attitudinal and behavioral improvements demonstrated over time, the Agency believes that [Father's] parenting style presents a significant risk to [J.A.'s] safety and emotional well-being. However, there is no denying the parent-child bond that exists between them should be fostered. Closely supervised visitation is appropriate at this time, which will be facilitated by the staff a Devereux Victoria group home."

On October 29, 2015, the court determined the Agency had made a prima facie showing that there were changed circumstances and the best interests of the minor required the modification sought. The court set a hearing for December 9, 2015.

L. *Section 388 Hearing*

In an addendum report, the social worker reported that Father had visited J.A. only once since his placement at Devereux and only once by telephone since the October 16, 2015 incident. The social worker spoke with Father, offering to make referrals for anger management, counseling, domestic violence treatment, and substance abuse. Father "adamantly and repeatedly refused to enter any type of therapeutic services that might

17

possibly mitigate the Agency's concerns. He stated, 'I've already done all those services and they don't do shit.' There is no better way I could have handled that situation.'"

The social worker stated the Agency was very concerned about J.A.'s well-being and safety if he were to resume unsupervised contact with Father, explaining:

> "Though there are no documented reports of violence between [J.A.] and his father directly, [J.A.] has shown that he is more than capable of considerable violence when provoked or emotionally unstable. [Father] has consistently dismissed or minimized [J.A.'s] many serious incident reports and has stated on many occasions that he and [J.A.] have never had any problems. However, the long separation between [J.A.] and his father, coupled with the disturbing manner in which [Father] appears to have dealt with his older son's defiance, presents significant risks to [J.A.'s] safety in the father's home.
>
> " . . . Regardless of whether or not [Father] was defending himself on 10/16/2015, the fact that the situation escalated to a physical altercation resulting in serious injuries to all parties is extremely concerning. The fact that he has displayed no remorse for the injuries his family sustained or taken any responsibility for his role in creating the situation is even more concerning. [¶] . . .
>
> "Based on these facts, his repeated declarations that nothing else could have been done to avoid violence in his home, and his adamant refusals to enter services that might mitigate these concerns, it is obvious to the Agency that [Father] lack[s] insight and is not fit to adequately parent [J.A.] at this time. Absent significant attitudinal and behavioral improvements demonstrated over time, the Agency cannot recommend unsupervised contact between the father and [J.A.]. Supervised visitation is appropriate at this time . . . ."

On December 9, 2015, the court conducted a hearing. Without objection, the court received in evidence the section 388 petition with its attachments, together with the Agency's reports of October 29 and December 9. The court also received in evidence J.A.'s stipulated testimony that he wants overnight visits with Father, does not think his visits need to be supervised, is not afraid to be unsupervised with Father, and if he cannot

18

have unsupervised visits with Father, he would like his aunt to be able to supervise Father's visits.

Father testified that he called the police on October 16, 2015 because of "some behavior that was getting out of control" between Tammy B. and their 17-year-old son. Father denied he was violent towards either of them. Father testified that as a result of that incident, Tammy B. and the son had moved out of the home and were not returning.

Father acknowledged he had visited J.A. only once at Devereux, but explained it was a three-and-a-half hour drive to the group home, and his work and finances prevented more frequent visits. Father testified that since October 2015, his sister had supervised three of his visits with J.A., including a four-day Thanksgiving weekend. Father admitted he did not ask the social worker whether his sister could supervise his visits.

Father testified that J.A. would be safe with him in an unsupervised setting, and was willing to attend family therapy with J.A., but he needed J.A. to be living with him to make therapy productive.

Father admitted he was "about to" drink a beer on the morning of the incident, but "[y]ou have to remember, the job I have now, I work at nights, so my schedule is different from what your schedule would be . . . ." He stated he had been having "problems" with the oldest son for "the past three years" and had "tried everything." Problems with him included his "threatening and trying to cut his wrist and running his mother and grandmother out of the house."

19

The social worker, Carson Jaffrey, testified he first learned of the October 16, 2015 incident from Tammy B., not Father. As a result, Jaffrey testified he had no confidence that Father would inform him of any problems if J.A. were placed back with Father. Jaffrey was particularly concerned that "given the significant history of issues that he's [Father] describing with the 17-year-old son and with [Tammy B.] in the home, I had not heard one word about any of those incidents up until this incident on the 16th of October." In the investigation of Father's Texas home, neither Father nor Tammy B. had disclosed there had been violence in the home or there were any issues relating to parenting the 17-year-old.

Jaffrey testified "the most concerning" aspect of the last domestic violence incident is that J.A., having been separated from Father for so long, "the dynamics between [J.A.] and his father are set up to be almost identical as those with [the 17-year-old] and his father."

After hearing counsels' respective closing arguments, the court granted the section 388 petition. The court stated she was "very familiar with this case. In fact, I reviewed the entire file again last night." The court explained it was exercising its discretion to require supervised visits for the following reasons:

> "The Court: . . . I have been very closely involved in this case, and in reviewing everything relating to the possibility of [J.A.] going home. [¶] . . . And I recall all of the testimony when [Tammy B.] was being offered as the supervisor of—potentially of [J.A.] when [Father] would be on the road. And the fact that the brother was in the home, and this would be wonderful for [J.A.] to have further bonding with [his brother].

20

"Not once, not ever was there a history of violence, of inability to control [the 17-year-old son] or disagreement between the parents in how to parent, and that is a significant concern to the court. That there was absolutely no free, open, and honest disclosure of this history that [Father] is now sharing with the court following another domestic violence incident." [¶] . . .

"[A]fter all that [Father] has been through, and multiple cycles of violence with multiple women, and on a number of occasions being the person who—whom violence was perpetrated against, [Father's] response to this is exceedingly concerning.

"I agree with the argument that he did not walk away. He did not do what he could to lessen the violence. He did call the police, as he has on prior occasions. But there was no effort[] to mitigate or control the situation so that it didn't rise to the level that it did which including arming himself with a hammer. [¶] . . .

" . . . I note that [Father] is not the one who disclosed the incident, it was [Tammy B.] who disclosed the incident. [¶] . . .

"Additionally, the court has significant concerns relating to the violation of the very clear court order on October 20th. That father's visitation with [J.A.], until this trial was to be held, was to be supervised on the premises of Devereux only. There was no discretions put in place. [¶] . . .

"[T]he court order couldn't have been any more clear, and [Father] was on the phone at that time. I recall distinctly. . . . And so this raises a very significant concern, after all of this time on this case, that [Father] is not following the court's orders.

"[T]he court has no—no assurance that any—that my court orders will be followed.

"So at this point in time, I do believe there are still services that need to be put in place, and I still think here is work to be done before [J.A.] can be safely returned to Father's home without any substantial risk of harm.

"With respect to the issue of visitation in the [section] 388 [petition], I am finding that there have been both changed circumstances, and I

21

find that it is in the best interest of [J.A.] to revert to—revert Father's visitation to supervised visitation."

On December 9, 2015, the court entered an order granting the section 388 petition. The order provides Father may have supervised visits on Devereux premises, and the social worker has discretion to allow Father's sister to supervise visitation with the advance concurrence of J.A.'s counsel and the court in an ex parte proceeding. The court directed the Agency to "continue to work with Father on the issue of conjoint therapy" and holiday visits. The court also stated it would "expand Father's supervised visits to include in a therapeutic setting at a location approved by the Agency." Finally, the court ordered that J.A. may visit with his aunt without Father being present.

On January 5, 2016, Father timely appealed from the order granting the section 388 petition.

## DISCUSSION

### I. *THE COURT DID NOT ABUSE ITS DISCRETION IN MODIFYING FATHER'S VISITATION FROM UNSUPERVISED TO SUPERVISED*

A. *Section 388 Elements and the Standard of Review*

Section 388 permits a person having an interest in the child to petition for a hearing to change, modify, or set aside any court order previously made on grounds of change of circumstance or new evidence. (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) To prevail, the petitioner must demonstrate by a preponderance of the evidence that new or changed circumstances warrant a change in the prior order to promote the best interest of the child. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.) "In considering whether the petitioner has made the requisite showing, the juvenile court may consider

22

the entire factual and procedural history of the case." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616.)

The requisite change of circumstances may be a change in the circumstances of a parent that makes modifying the prior order appropriate. (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116.) In assessing the best interests of the child, "'a primary consideration . . . is the goal of assuring stability and continuity.'" (*In re Mickel O., supra,* 197 Cal.App.4th at p. 616.)

A section 388 petition is "'committed to the sound discretion of the juvenile court, and [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.'" (*In re A.R., supra,* 235 Cal.App.4th at pp. 1116-1117.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" (*Id.* at p. 1117.) The juvenile court's decision will not be disturbed unless the court "'"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Father concedes in his opening brief that the October 16, 2015 altercation constitutes changed circumstances. Accordingly, the only issue on appeal is whether the court abused its discretion in determining that as a result of the changed circumstances, it

was in J.A.'s best interest to have supervised as opposed to unsupervised visitation with Father.[7]

B. *The Court Did Not Abuse Its Discretion*

The court did not abuse its discretion in determining that supervised visitation was in J.A.'s best interests. Before conducting the hearing, the court reviewed the entire file and became "very familiar with this case." Moreover, the court stated its reasons for granting the section 388 petition in detail on the record, stating that she wanted the basis for decision to be "very clear." Thus, as a matter of procedure or process, the ruling here is a model of how courts should exercise discretion.

Substantively, the court did not abuse its discretion in determining that Father had a propensity and pattern of domestic violence that would be detrimental to J.A.'s physical and emotional well-being in unsupervised visits. In October 2015 Father hit one of his other sons in the head with a hammer, causing a concussion. This was not an isolated incident, no aberration. Tammy B. told the social worker that Father's method of discipline is to "hit children with weapons." In September 2015 a neighbor called the police, reporting that Father was attempting to run over his 17-year-old son with a motor vehicle.

----

7    Father's opening brief frames the issue as follows: "The issue to be analyzed by this Court of Appeal is whether [J.A.] would be better served by having unsupervised visits with his father or by requiring that their visits be restricted to supervised visits." This misstates the issue because it ignores the standard of review. On appeal, the issue is whether the juvenile court *abused its discretion* in determining supervised visits were in J.A.'s best interest.

24

Father denies and disputes these assertions. He testified he "never" has been violent toward Tammy B, did not strike her, and was not violent towards the oldest son in the October 2015 incident. Father contends he was the victim, not aggressor in all these instances, noting that the oldest son and Tammy B. were arrested for the October 2015 incident and he was not. Father emphasizes one sentence from Tammy B.'s interview with the social worker, where she stated J.A. would be "perfectly safe" with Father, as compelling evidence the juvenile court abused its discretion in requiring supervised visitation.

However, the court was entitled to, and did, disbelieve Father's self-serving testimony and was required to place Tammy B's statements in proper context. The court expressly found that Father armed himself with a hammer in the October 2015 domestic violence incident that triggered the section 388 petition. This finding is based on substantial evidence consisting of the social worker's reports of his interview with the 17-year-old son and Tammy B., which were received in evidence without objection.

Father tells a completely different story about the hammer-wielding domestic violence. But his credibility was substantially undercut by his failure to inform the social worker or the court about the ongoing serious domestic violence incidents in May and September 2015. As the juvenile court specifically noted, "[T]here was absolutely no free, open and honest disclosure of this history . . . ." The juvenile court did not abuse its discretion in determining that Father's non-disclosure, if not active concealment of ongoing domestic violence incidents in his home, was an "extreme concern to the court."

Father's brief states the court's finding lacks support because Tammy B. told the social worker that J.A. would be "perfectly safe" with Father. However, Father omits other statements Tammy B. made that undermine the probative value of that assertion. For example, Tammy B. also told the social worker that Father "is after me" and she was "afraid to state any information that might be perceived as damaging to [Father] and his chances of regaining custody of [J.A.]." Thus, when Tammy B.'s statement is viewed in context of her entire statement, the court could have reasonably concluded Tammy B. was not being truthful in stating J.A. would be safe with Father, and was only saying so to avoid further violent retribution by Father.

In sum, the entire evidentiary record, which includes unrefuted evidence that their oldest son sustained a blow to the head and Father attempted to run him over with his motor vehicle, supports the court's determination that Father recently committed acts of domestic violence.

On this ground alone, the court's finding that it is in J.A.'s best interests to have supervised visits is amply justified. Moreover, Father essentially admitted he could not control his anger and inappropriate behavior, telling the social worker that the domestic violence therapy and counseling he attended "don't do shit."

Additionally, the juvenile court was also properly concerned that Father took no action to lessen or reduce the violence with Tammy B. and their 17-year-old son. As the court noted, [T]here was no effort[] to mitigate or control the situation so that it didn't rise to the level that it did which including him arming himself with a hammer."

Father contends the court abused its discretion in ordering supervised visits because there is no evidence he was ever violent with J.A. Father contends the social worker provided "nothing more than conjecture" that Father's violence towards his oldest son indicated Father may also be violent with J.A.

Father's argument fails, however, because it ignores the applicable standard of review. We are required to draw all reasonable inferences in favor of the court's determination. Here, there is substantial evidence to support a reasonable inference that Father's pattern of family violence is not person-specific, and a violent confrontation could erupt in an unsupervised visit with J.A. Father has demonstrated he is a violent man. He was violent with Tammy B. He was violent with his oldest son. Tammy B. said that Father "likes to hit children with weapons." And finally, Father's pattern of speech indicates violent tendencies towards even the social worker, when Father said he would "kick your fucking ass you motherfucker" and then "[f]uck you in your ass bitch."

Father's lawyer attempts to soft-peddle this profanity, characterizing it as harmless and perhaps even healthy "venting" of strong parenthood emotions. However, the juvenile court was well within its discretion to conclude otherwise—that Father's profanity reflects a violent disposition that makes unsupervised visitation not in J.A.'s best interests.

The social worker stated that although there were no documented reports of violence between J.A. and Father, "[J.A.] has shown that he is more than capable of considerable violence when provoked or emotionally unstable." This, coupled with Father's own violent behavior, made the Agency "very concerned about the safety and

well-being of [J.A.] should he resume unsupervised contact with his father at this time."
This assessment is reasonable, supported by substantial evidence, and the juvenile court did not abuse its discretion in following the Agency's recommendation in this case.

DISPOSITION

The order is affirmed.


NARES, Acting P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.

28